John R. Armstrong, Cal Bar. No. 183912
Ryan Thomason, Cal. Bar. No. 325621
**HORWITZ + ARMSTRONG**
A PROFESSIONAL LAW CORPORATION
14 Orchard, Suite 200
Lake Forest, CA 92630
Telephone: (949) 540-6540
Facsimile: (949) 540-6578
Attorneys for Defendants
GROWLIFE, INC., MARCO HEGYI and MARK SCOTT

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| WILLIAM BLACKBURN, BRAD MICKELSEN, <br><br> Plaintiffs, <br><br> vs. <br><br> GROWLIFE, INC., a Delaware corporation; MARCO HEGYI, an individual; MARK SCOTT, an individual; and DOES 1 – 100, inclusive, <br><br> Defendants. | Case No.: <br><br> (Sacramento County Superior Court Case Number: 34-2020-00284363-CU-BC-GDS) <br><br> **NOTICE OF REMOVAL; EXHIBIT A [CALIF. STATE COURT FILE]** <br><br> **FILED CONCURRENTLY WITH SUPPORTING DECLARATION OF MARCO HEGYI** |

PLEASE TAKE NOTICE THAT under Title 28 U.S.C., §§ 1332, 1441, and 1446, Defendants GrowLife, Inc., Marco Hegyi, and Mark Scott (hereafter "Defendants") now remove this civil action from the Superior Court of California of and for Sacramento County, California, where it is currently pending as Case No. 34-2020-00284363-CU-BC-GDS, to the United States District Court for the Eastern District of

California, the judicial district nearest where plaintiffs filed their action in the California state court. Once removed, defendants further intend to move to change venue to the United States District Court for the Western District of Washington as this where all defendants reside, including the individually named defendants. What follows are the facts supporting this Notice of Removal.

1.     William Blackburn and Brad Mickelsen (hereafter "Plaintiffs") commenced this action on August 28, 2020 by filing a Complaint in the Superior Court of California for the County of Sacramento.

2.     The Complaint alleges that Defendant Growlife, Inc. is a corporation organized under the laws of the state of Delaware and registered to do business in California.  (Plaintiffs' Complaint ["Compl."] p.2, ¶ 4.)

3.     The Complaint further alleges that Defendant Marco Hegyi is a resident of California and Chief Executive Officer and Chairman of the Board of Directors of Growlife, Inc.  (Compl. ¶ 5.)

4.     The Complaint also alleges that Defendant Mark Scott is a resident of the state of Washington and is the Chief Financial Officer and a member of the Board of Directors of Growlife, Inc.  (Compl. ¶ 6.)

5.     Plaintiffs assert claims for (1) relief based on rescission; (2) intentional misrepresentation; (3) negligent misrepresentation; (4) breach of contract; (5) breach of covenant of good faith; (6) breach of fiduciary duty; (7) breach of employment contract; (8) violation of labor code; (9) preliminary and permanent injunctive relief; and (10) declaratory relief.

6.     Plaintiffs seek to recover general, special, consequential, exemplary, and punitive damages according to proof at trial.  Plaintiffs also seek rescission of the PSA, restitution and disgorgement of all illicit distributions alleged in the Complaint and that may be later discovered during the action.

7.     Plaintiffs request all statutory penalties that may be awardable in this action as well as temporary restraining order, preliminary injunction, and permanent injunction.

8.  Plaintiffs allege that, "The second stage of the transaction was required by the PSA to be completed on or 21 before October 15, 2019. The second part of the transaction is referred to as the 'Second Closing.' At the Second Closing, Grow life was obligated to pay Plaintiffs the aggregate sum of One Million Nine Hundred Sixty Thousand dollars $1,960,000) payable as an $855,000 cash payment together 24 with transfer of Eighty-Five Million (85,000,000) shares of GrowLife's common stock at a price of $.013 per share, which was the cash equivalent of $1,105,000. In exchange, Plaintiffs were obligated to transfer the remaining 24,500 shares of EZC stock to Growlife, which accounted for forty-nine percent (49%) of the total issued and outstanding stock of EZC." (Compl., p.3, ¶12.)

9.  Plaintiffs further allege in the next Paragraph in their Complaint that defendants defrauded them by failing to pay plaintiffs $855,000 in cash and $1,105,000 in GrowLife stock: "Completion of the entirety of both the First Closing and Second Closing was a critical component of Plaintiffs' consent to the PSA. If Plaintiffs had known that GrowLife would be unable to perform the Second Closing, Plaintiffs would not have entered the PSA at all. Indeed, the Second Closing was

absolutely critical to Plaintiffs' willingness to enter the PSA in the first instance. As a 50% shareholder of EZC, and the president of EZC, Blackbum had day-to-day control over EZC's operations and could, in conjunction with Mickelsen's 50% ownership interest, make strategic decisions in EZC's best interests. Plaintiffs agreed to give up their ownership interest in EZC in exchange for cash payments promised by GrowLife, together with substantial shares of GrowLife stock at a specified value. Without the consideration included in the Second Closing, Plaintiffs never would have agreed to the PSA, and never would have agreed to give up their ownership interest in EZC. **Accordingly, GrowLife's failure to perform has prevented Plaintiffs from enjoying the benefit for which they bargained and has placed them in a substantially worse position**." (Compl., pp. 3-4, ¶13 [bold added for emphasis].)

## I.   This Court has original jurisdiction over this action

10.   This Court has subject matter jurisdiction under 28 U.S.C. § 1332, which confers original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States."

### A.   The amount in controversy exceeds $75,000

11.   The amount in controversy exceeds $75,000, exclusive of interest and costs.[1]  Plaintiffs seeks to recover general, special, and

---

[1] Defendants do not concede that Plaintiffs are in fact entitled to recover any damages, but concedes that Plaintiffs are *claiming* relief that exceeds $75,000, exclusive of interest and costs.  *See Kelderman v. Remington Arms*, 734 F. Supp. 1527, 1528 (S.D. Iowa 1990) (rejecting plaintiff's attempt to "place [a] defendant in the awkward position of embracing a concession on the important issues of damages" to establish jurisdiction).

compensatory damages, including but not limited to attorneys' fees, expenses, statutory penalties, restitution, and disgorgement of all illicit distributions.

12.     When a complaint does not demand a specific amount, the court must determine whether it is "facially apparent from the complaint that the jurisdictional amount is in controversy." *Singer v. State Farm Mut. Auto. Ins.*, 116 F.3d 373, 377 (9th Cir. 1997).

13.     Plaintiffs seek punitive damages, which must be included in the amount in controversy. *Gibson v. Chrysler*, 261 F.3d 927, 945 (9th Cir. 2001). Including punitive damages in the amount in controversy here allows no doubt that the jurisdictional requirement is met.

**B.     Complete diversity exists in that Plaintiffs are residents of California and all Defendants, including the individual Defendants, are residents of the State of Washington**

14.     Complete diversity of citizenship exists between the Plaintiffs and the Defendants.

15.     At the time this lawsuit was filed and all times since, Defendant GrowLife, Inc. was and is a Delaware corporation with its principal place of business/corporate nerve center in Kirkland, Washington.

16.     At the time this lawsuit was filed and all times since, Defendant Marco Hegyi, is a resident of the state of Washington, and is *not* a California resident, as Plaintiffs have alleged. (Declaration of Marco Hegyi ("Hegyi Dec.") ¶ 5, Exhibit 2).

17.    Plaintiffs' pleading allegation regarding Mr. Heygi's is false, sham, and done with the improper purpose of trying to prevent federal diversity jurisdiction.

18.    At the time this lawsuit was filed and all times since, Defendant Mark Scott was and is a resident of the state of Washington. (Compl., p. 2, ¶6.)

19.    The Complaint also names as Defendants "Does 1-100." Under 28 U.S.C. § 1441(b), "the citizenship of defendants sued under fictitious names shall be disregarded."

20.    The citizenship of the "Doe" Defendants is not considered when the charges against the "Doe" Defendants are so general that no clues exist as to their identity. *Robinson v. Lowe's Home Ctrs., LLC*, No. 1:15-cv-1321-LJO-SMS, 2015 U.S. Dist. LEXIS 154077, at *8-9 (E.D. Cal. Nov. 13, 2015).

21.    Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship." *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994)). A corporation, on the other hand, is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." *Gadlin v. Sybron Int'l Corp.*, 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).

22.    In the Ninth Circuit, federal district courts are not bound by a Plaintiff's false or incorrect allegations regarding the citizenship of defendants to determine its jurisdiction; federal district courts may consider matters outside the pleadings like like declarations to determine whether diversity jurisdiction exists. See *Adler v. Fed.*

*Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997) (holding that district court did not err in considering declaration outside of pleadings, and that district courts have broad discretion to find facts pertinent to jurisdiction); see 13E *Wright & Miller* § 3602.1, p. 111; *id.* § 3602.1 at 107–18.

### C.    All other requirements for removal are satisfied.

23.    This Notice of Removal is timely filed.  Each defendant has "30 days … after receipt … of the initial pleading … to file a notice of removal."  28 U.S.C. § 1441(a).  Defendants were served on September 1, 2020.  This Notice of Removal is filed within 30 days of that date.

24.    This Court is a proper venue for this action, under Title 28 U.SC. § 1446(a), a copy of all process, pleadings, and orders served upon Defendants, including the Summons and Complaint, is attached hereto as Exhibit A.

25.    Under Title 28 U.S.C. § 1446(d), a Notice of Filing Notice of Removal and the Notice will be served upon counsel for Plaintiffs and will be filed with the clerk of the Superior Court of the County of Sacramento.

26.    If any questions arise with regard to the removal of this action, Defendants respectfully request the opportunity to be heard on it.

///

///

///

WHERFORE, Defendants respectfully request removal of this action from the Superior Court of the County of Sacramento, in the State of California, bearings Case No. 34-2020-00284363-CU-BC-GDS, to this Court.


Dated:  September 14, 2020

HORWITZ + ARMSTRONG, PLC


By _____/s/ Ryan Thomason_____

JOHN R. ARMSTRONG
RYAN THOMASON
Attorneys for Defendants
GROWLIFE, INC., MARCO HEGYI and MARK SCOTT

EXHIBIT A

**SUM-100**

**SUMMONS**
**(CITACION JUDICIAL)**

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Growlife, Inc., a Delaware corporation; Marco
Hegyi, an individual; Mark Scott, an individual;
and DOES 1-100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
William Blackburn, Brad Mickelsen

**FILED/ENDORSED**

SEP - 8 2020

By: _____ L. Gutierrez
Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California, County of Sacramento<br>720 Ninth Street<br>Sacramento, CA 95814 | **CASE NUMBER**<br>*(Número del Caso):*<br><br>**BY FAX** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Treven Tilbury 210052                          Reynolds Tilbury Woodward LLP
11601 Blocker Drive, Suite 105                                (530) 885-8500
Auburn, CA 95603

| DATE:<br>*(Fecha)*  SEP - 8 2020 | Clerk, by<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

CEB | Essential
ceb.com | Forms

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov


William Blackburn

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Treven Tilbury 210052
Reynolds Tilbury Woodward LLP
11601 Blocker Drive, Suite 105
Auburn, CA 95603
TELEPHONE NO: (530) 885-8500  FAX NO: (530) 885-8113
ATTORNEY FOR (Name): Plaintiffs, William Blackburn and Brad Mickelsen

**FILED/ENDORSED**

AUG 28 2020

By: ___L. Gutierrez___
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF *Sacramento*
STREET ADDRESS: 720 Ninth Street
MAILING ADDRESS: 720 Ninth Street
CITY AND ZIP CODE: Sacramento, CA 95814
BRANCH NAME: Gordon D. Schaber Courthouse

CASE NAME: Blackburn, et al. v. Growlife, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:

a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

**BY FAX**

3. Remedies sought *(check all that apply)*: a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* Nine
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 28, 2020

Treven Tilbury
_____
(TYPE OR PRINT NAME)   ▶   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CEB | **Essential Forms**
ceb.com

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

William Blackburn

1  Treven I. Tilbury (SBN 210052)
2  Adrian J. Webber (SBN 259118)
   REYNOLDS TILBURY WOODWARD LLP
3  11601 Blocker Drive, Suite 105
   Auburn, CA 95603
4  Telephone: (530) 885-8500
   Facsimile: (530) 885-8113
5
6  Attorneys for Plaintiffs WILLIAM BLACKBURN
   and BRAD MICKELSEN
7
8
9
                    SUPERIOR COURT OF CALIFORNIA
10
                IN AND FOR THE COUNTY OF SACRAMENTO
11
12  WILLIAM BLACKBURN, BRAD          Case No.: 34·2020· 00284363
    MICKELSEN,
13                                   **COMPLAINT FOR RELIEF BASED ON**
14            Plaintiffs,            **RESCISSION, INTENTIONAL**
                                     **MISREPRESENTATION, NEGLIGENT**
15       vs.                         **MISREPRESENTATION, BREACH OF**
                                     **CONTRACT, BREACH OF COVENANT**
16  GROWLIFE, INC., a Delaware corporation;  **OF GOOD FAITH, BREACH OF**
    MARCO HEGYI, an individual; MARK  **FIDUCIARY DUTY, BREACH OF**
17  SCOTT, an individual; and DOES 1 - 100,  **EMPLOYMENT CONTRACT,**
    inclusive,                       **VIOLATION OF LABOR CODE,**
18                                   **PRELIMINARY AND PERMANENT**
            Defendants.              **INJUNCTION, DECLARATORY RELIEF**
19
20
21                                   **BY FAX**
22                                   Amount demanded exceeds
                                        $10,000
23
                                     UNLIMITED CIVIL CASE
24
25
26
27
28

{00012158.7}

1
COMPLAINT

1    Plaintiffs William Blackburn and Brad Mickelsen allege as follows:

2    **GENERAL ALLEGATIONS**

3    1.    Plaintiff William Blackburn ("Blackburn") is, and at all times herein mentioned was,

4    a resident of El Dorado County, California.  Plaintiff is one of the founders of EZ-CLONE

5    Enterprises, Inc.

6    2.    Plaintiff Brad Mickelsen ("Mickelsen") is an individual residing in El Dorado

7    County, California.  Mickelsen is one of the founders of EZC.  Plaintiffs Blackburn and Mickelsen

8    are collectively referred to herein as "Plaintiffs."

9    3.    EZ-CLONE Enterprises, Inc. ("EZC") is a California corporation doing business in

10   Sacramento County, California.

11   4.    Defendant Growlife, Inc. ("Growlife") is a corporation organized under the laws of

12   the State of Delaware and registered to do business in California.

13   5.    Defendant Marco Hegyi ("Hegyi") is a resident of California and is the Chief

14   Executive Officer and Chairman of the Board of Directors of Growlife.

15   6.    Defendant Mark Scott ("Scott") is a resident of the State of Washington and is the

16   Chief Financial Officer and a member of the board of directors of Growlife.

17   7.    Defendants Does 1 through 100, inclusive, are sued herein under fictitious names.

18   Their true names and capacities are unknown to Plaintiffs. When their true names and capacities are

19   ascertained, Plaintiffs will amend this complaint by inserting their true names and capacities herein.

20   Plaintiffs are informed and believe and thereon allege, that each of the fictitiously named Defendants

21   is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as

22   herein alleged were proximately caused by those Defendants.

23   8.    Plaintiffs are informed and believe and thereon allege that at all times herein

24   mentioned, Defendants Does 1 through 100 were agents, servants, and employees of their Co-

25   Defendants, and in doing the things hereinafter alleged were acting in the scope of their authority as

26   agents, servants, and employees, and with the permission and consent of their Co-Defendants.

27   Plaintiffs are also informed and believe and thereon allege that Does 1 through 100 and each of the

28   named Defendants are jointly and severally liable for all monetary compensation alleged in this

{00012158.7}

1 │ Complaint.

2 │     9.    In or about 2002, Plaintiffs founded EZC as a California corporation to manufacture

3 │ and sell hydroponics equipment across the United States. Plaintiffs each owned 50% of the total

4 │ number of shares issued by EZC.

5 │     10.    In or about October 2018, Plaintiffs, EZC, and Growlife entered into an agreement

6 │ titled "Purchase and Sale Agreement" ("PSA"). Under the PSA, Growlife was to purchase shares of

7 │ stock in EZC from Plaintiffs. The PSA called for Growlife to provide certain consideration in the

8 │ form of cash and a cash-equivalent amount of Growlife stock to Plaintiffs, and in exchange Plaintiffs

9 │ would provide certain shares of EZC stock to Growlife. The PSA called for the purchase to take

10 │ place in two primary stages.

11 │     11.    The first stage of the transaction was required by the PSA to be completed on or

12 │ before October 15, 2018. The first part of the transaction is referred to as the "First Closing." At the

13 │ First Closing, Growlife was obligated to pay to Plaintiffs the aggregate sum of Two Million Forty

14 │ Thousand Dollars ($2,040,000) payable as a cash payment of $645,000, plus One Hundred Seven

15 │ Million Three Hundred Seven Thousands Six Hundred Ninety Two (107,307,692) restricted shares

16 │ of Growlife's common stock at a price of $.013 per share, which was the cash equivalent of

17 │ $1,395,000. In exchange, Plaintiffs were required to transfer 25,500 shares of EZC stock to

18 │ Growlife, which accounted for fifty-one percent (51%) of the total issued and outstanding stock of

19 │ EZC.

20 │     12.    The second stage of the transaction was required by the PSA to be completed on or

21 │ before October 15, 2019. The second part of the transaction is referred to as the "Second Closing."

22 │ At the Second Closing, Growlife was obligated to pay Plaintiffs the aggregate sum of One Million

23 │ Nine Hundred Sixty Thousand dollars ($1,960,000) payable as an $855,000 cash payment together

24 │ with transfer of Eighty-Five Million (85,000,000) shares of Growlife's common stock at a price of

25 │ $.013 per share, which was the cash equivalent of $1,105,000. In exchange, Plaintiffs were

26 │ obligated to transfer the remaining 24,500 shares of EZC stock to Growlife, which accounted for

27 │ forty-nine percent (49%) of the total issued and outstanding stock of EZC.

28 │     13.    Completion of the entirety of both the First Closing and Second Closing was a critical

{00012158.7}

1  | component of Plaintiffs' consent to the PSA. If Plaintiffs had known that Growlife would be unable
2  | to perform the Second Closing, Plaintiffs would not have entered the PSA at all. Indeed, the Second
3  | Closing was absolutely critical to Plaintiffs' willingness to enter the PSA in the first instance. As a
4  | 50% shareholder of EZC, and the president of EZC, Blackburn had day-to-day control over EZC's
5  | operations and could, in conjunction with Mickelsen's 50% ownership interest, make strategic
6  | decisions in EZC's best interests. Plaintiffs agreed to give up their ownership interest in EZC in
7  | exchange for cash payments promised by Growlife, together with substantial shares of Growlife
8  | stock at a specified value. Without the consideration included in the Second Closing, Plaintiffs
9  | never would have agreed to the PSA, and never would have agreed to give up their ownership
10 | interest in EZC. Accordingly, Growlife's failure to perform has prevented Plaintiffs from enjoying
11 | the benefit for which they bargained and has placed them in a substantially worse position.

12 |     14.    Under Article III titled "Representations and Warranties of the Buyer," the PSA also
13 | contained numerous representations by Growlife, including that at the time of the First Closing,
14 | Growlife would have "sufficient cash on hand or other sources of immediately available funds" to
15 | enable it to "consummate the transactions contemplated by this Agreement." Plaintiffs are informed
16 | and believe that Growlife actually did not have the sources of funds available to enable it to
17 | consummate the transactions contemplated by the PSA at the time of the First Closing.

18 |     15.    The PSA also requires that, "after the First Closing and until the Second Closing,"
19 | Blackburn shall "continue to manage all aspects of the business, including, without limitation, (i)
20 | determining the fees and prices charged by the Company, (ii) determining the compensation paid to
21 | employees or independent contractors of the Company, (iii) determining whether to discontinue or
22 | modify the Company's business or any program related thereto, (iv) making any decisions
23 | concerning the production, marketing, sales, capital expenditures, expenses and related matters
24 | respecting the Company and (v) making any decisions pertaining to the personnel, staffing and other
25 | resources of the Company." In addition, the PSA obligates EZC to "operate the business consistent
26 | with the Company's standard operating procedures as of the date of the Agreement, unless otherwise
27 | agreed between the Sellers and Buyer." As alleged in detail herein, Growlife's demands on EZC
28 | have been inconsistent with the PSA and inconsistent with the standard operating procedures as of

{00012158.7}

1 | the date of the PSA.

2      16.    The Second Closing did not occur on the date required by the PSA and has not
3 | occurred at any time since that date.  All conditions precedent to the Second Closing have occurred
4 | or are excused by Defendants' failure to perform.

5      17.    On July 10, 2020, Hegyi represented in a phone call that Growlife could not and
6 | would not be able to perform its obligations under the Second Closing by July 18, 2020.
7 | Accordingly, Growlife repudiated the PSA.

8      18.    Plaintiffs are informed and believe, and based thereon allege, that Defendants are not
9 | financially able to pay an award of damages Plaintiffs might obtain in this action, and therefore
10 | Plaintiffs do not possess an adequate remedy at law.

11                         **FIRST CAUSE OF ACTION**
12                        **(Relief Based on Rescission)**

13      19.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 18 of this Complaint
14 | as if fully set forth herein.

15      20.    On or about October 10, 2018, Defendants, knowing the representations to be false
16 | and with the intent to deceive Plaintiffs and to induce them to enter into the PSA, falsely and
17 | fraudulently represented to Plaintiffs that as of the date of the First Closing, Growlife had "sufficient
18 | cash on hand or other sources of immediately available funds" to enable it to "consummate the
19 | transactions contemplated by [the PSA]."

20      21.    The representations made by Defendants were in fact false. The true facts were that
21 | Growlife did not have sufficient cash on hand or sources of immediately available funds necessary to
22 | consummate each of the transactions contemplated by the PSA, including without limitation, the
23 | Second Closing.

24      22.    At the time the representations were made, at the time Plaintiffs entered into the PSA,
25 | and at the time Plaintiffs rendered their performance under the PSA, Plaintiffs did not know
26 | Defendants' representations were false, but rather believed them to be true and reasonably relied on
27 | them.

28      23.    Under the terms of the PSA, Plaintiffs collectively transferred 25,500 shares of EZC

{00012158.7}

1   stock (the controlling portion of EZC stock) to Growlife, and performed all other obligations

2   required of Plaintiffs under the PSA.  Plaintiff Mickelsen transferred 12,750 shares of EZC stock,

3   and Plaintiff Blackburn transferred 12,750 shares of EZC stock. The stock Plaintiffs transferred to

4   Growlife under the PSA collectively accounted for 51% of the then-outstanding shares of EZC

5   stock.

6      24.    On or about October 15, 2019, and again as of July 18, 2020, Defendants failed to

7   perform under the PSA by failing to consummate the Second Closing.

8      25.    Growlife does not now nor ever had the necessary funds to consummate the Second

9   Closing.

10     26.    In October 2019, Defendants requested that Plaintiffs enter into an extension

11   agreement ("Extension") to extend the date of the Second Closing.  The Extension expressly

12   incorporated the terms of the PSA, including Growlife's representations and warranties.  Growlife

13   reaffirmed the representations from the PSA, which remained false and misleading, and therefore

14   committed a second misrepresentation.  Plaintiffs agreed to the Extension based on Growlife's

15   misrepresentations.  Growlife has failed to perform the terms of the Extension.

16     27.    Plaintiffs have and will continue to suffer substantial and irreparable harm and

17   injury under the PSA if the PSA is not rescinded in that as a result of Growlife's conduct, Plaintiffs

18   have, based on the Defendants' misrepresentations, failed consideration, and mistakes of fact,

19   relinquished shares of stock that makes Growlife the majority shareholder of EZC, and which also

20   makes Plaintiffs minority shareholders in EZC despite Plaintiffs not having received the bargained-

21   for consideration.  Moreover, Plaintiffs are informed and believe that Growlife is unable to pay any

22   damages that would be awarded to Plaintiffs.

23     28.    On or about July 20, 2020, Plaintiff Blackburn notified Defendants in writing that he

24   had rescinded the PSA on the grounds of misrepresentation, mistake of fact, and failure of

25   consideration (the "Rescission Notice").  On August 17, 2020, Plaintiff Mickelsen provided notice of

26   rescission to Defendants, and expressly joined into the Rescission Notice.  The Rescission Notice

27   was served on Defendants in compliance with the requirements of the PSA, as well as via electronic

28   mail.  Defendants acknowledged receipt of the Rescission Notice.  Defendants refused, and continue

{00012158.7}

1   to refuse, to restore to Plaintiffs, in whole or in part, the consideration paid by Plaintiffs or to

2   recognize that the PSA has been rescinded.

3        29.     Plaintiffs demand restoration of the EZC stock they transferred to Growlife as part of

4   the First Closing, together with restoration of all consideration exchanged as part of the PSA,

5   including all consideration paid by Growlife.  Further, Plaintiffs are entitled to an award of

6   rescission damages and other equitable relief necessary to return Plaintiffs to the position they would

7   be in if the PSA had never been partially performed.

8        30.     If the Court determines that Plaintiffs' notice of rescission is inadequate in any way,

9   Plaintiffs intend service of the summons and complaint in this action to serve as notice of rescission

10  of the PSA, and hereby offers to restore all consideration furnished by Defendants under the PSA, on

11  condition that Defendants restore to Plaintiffs the consideration furnished by Plaintiffs, specifically

12  all shares of stock in EZC, together with Plaintiffs' proportionate share of all amounts Defendant has

13  borrowed from EZC since the PSA was executed, plus additional equitable relief to be proved at

14  trial.

15       31.     As a result of entering into the PSA with Defendants, Plaintiffs have incurred

16  expenses in addition to those alleged above in an amount to be proved at trial.

17       32.     Because Plaintiffs' consent to the PSA was obtained through misrepresentation and

18  mistake of fact, and because the consideration that Plaintiffs were to receive under the PSA has

19  failed, Plaintiffs are entitled to rescind the PSA.

20       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

21  hereinafter set forth.

22                         **SECOND CAUSE OF ACTION**

23                         **(Intentional Misrepresentation)**

24       33.     Plaintiffs reallege and incorporate herein Paragraphs 1 through 32 of this Complaint

25  as if fully set forth herein.

26       34.     Defendants expressly represented to Plaintiffs that at the time of the First Closing,

27  Buyer "shall have cash on hand or other sources of immediately available funds to enable it to . . .

28  consummate the transactions contemplated by this Agreement."  The Second Closing was a

{00012158.7}

1   transaction contemplated by the PSA. However, Defendants did not then have, nor has it obtained,

2   sufficient cash on hand or other sources of immediately available funds to enable it to consummate

3   the Second Closing. Plaintiffs relied on Defendants' representation by agreeing to transfer their

4   controlling ownership interest in EZC in exchange for Defendants' promised consideration at the

5   Second Closing. Further, Plaintiffs relied on Defendants' representations by not requiring that a

6   security agreement be executed to secure payment of the Second Closing. Further, Plaintiffs relied

7   on Defendants' representation by not requiring a third-party guaranty of Defendants' payment

8   obligations. Plaintiffs' reliance on Defendants' representation was reasonable in light of all of the

9   circumstances.

10      35.     Defendants failed to disclose material facts to Plaintiffs about the PSA. Most

11   notably, Defendants' financial condition at the time the PSA was agreed to was far weaker than

12   represented by Defendants. At the time of the PSA, Defendants had incurred substantial debt

13   convertible to equity, which created the substantial risk that Defendants' stock price would be badly

14   diluted as the debt was converted to equity in ever-larger amounts. Despite this information being

15   material to a decision to enter into the PSA, Defendants did not disclose the information to Plaintiffs.

16      36.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been

17   damaged in an amount to be proven at trial.

18      37.     In performing the acts herein alleged, Defendants intentionally misrepresented and

19   concealed from Plaintiffs material facts known to Defendants, specifically that Defendants did not

20   have the available funds to conclude the Second Closing, and that Growlife's financial situation was

21   considerably worse than was represented to Plaintiffs, with the intention on the part of Defendants of

22   depriving Plaintiffs of their money and property, thereby justifying an award of punitive damages

23   against Defendants.

24      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

25   hereinafter set forth.

26   ///

27   ///

28   ///

{00012158.7}

**THIRD CAUSE OF ACTION**

**(Negligent Misrepresentation)**

38.   Plaintiffs reallege and incorporate herein Paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39.   As alleged herein, Defendants misrepresented material facts relating to the PSA in order to and with the specific intention to induce Plaintiffs to agree to the PSA.

40.   Defendants expressly represented to Plaintiffs at the time of the First Closing, Buyer "shall have cash on hand or other sources of immediately available funds to enable it to . . . consummate the transactions contemplated by this Agreement." The Second Closing was a transaction contemplated by the PSA. However, Defendants did not then have, nor has it obtained, sufficient cash on hand or other sources of immediately available funds to enable it to consummate the Second Closing. Plaintiffs relied on Defendants' representation by agreeing to transfer their controlling ownership interest in EZC in exchange for Defendants' promised consideration at the Second Closing. Further, Plaintiffs relied on Defendants' representations by not requiring that a security agreement be executed to secure payment of the Second Closing. Further, Plaintiffs relied on Defendants' representation by not requiring a third-party guaranty of Defendants' payment obligations. Plaintiffs' reliance on Defendants' representation was reasonable in light of all of the circumstances.

41.   Defendants failed to disclose material facts to Plaintiffs about the PSA. Most notably, Defendants' financial condition at the time the PSA was agreed to was far weaker than represented by Defendants. At the time of the PSA, Defendants had incurred substantial debt convertible to equity, which created the substantial risk that Defendants' stock price would be badly diluted as the debt was converted to equity in ever-larger amounts. Despite this information being material to a decision to enter into the PSA, Defendants did not disclose the information to Plaintiffs.

42.   As an alternative cause of action, if Defendants' misrepresentations were not intentional, then they were the result of negligence and/or gross negligence by Defendants.

43.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined at trial.

{00012158.7}

1    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

2    hereinafter set forth.

3                              **FOURTH CAUSE OF ACTION**

4                          **(Breach of Contract against Growlife)**

5          44.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 43 of this Complaint

6    as if fully set forth herein.

7          45.    In the alternative, Plaintiffs also allege that Defendant Growlife breached the PSA.

8          46.    On or about October 2018, in Sacramento County, California, Defendants became

·9    indebted to Plaintiffs in the sum of $4,000,000 as set forth in the PSA.

10         47.    Plaintiffs performed all, or substantially all, of the things they were required to do

11   pursuant to the PSA.

12         48.    Defendants failed to perform the PSA in numerous respects, including:

13                      a.   Failing to comply with the PSA's representations and warranties;

14                      b.   Failing to perform the promises and exchange the consideration required by

15                           the Second Closing;

16                      c.   Failing to pay $20,000 for the audit as required by PSA Paragraph 9.03.

17         49.    There is now due, owing, and unpaid from Defendants to Plaintiffs the sum of at least

18   $1,960,000, together with interest thereon at the legal rate from October 2019.

19         50.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been

20   damaged in an amount subject to proof at trial as they have not received consideration they were

21   entitled to receive pursuant to the PSA.

22         WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

23   hereinafter set forth.

24                              **FIFTH CAUSE OF ACTION**

25                      **(Breach of Covenant of Good Faith against Growlife)**

26         51.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 50 of this Complaint

27   as if fully set forth herein.

28         52.    In the alternative, Plaintiffs also allege that Defendants breached the covenant of

{00012158.7}

1  good faith and fair dealing by denying Plaintiffs the benefits of the bargain to which they agreed.

2  Further, Defendants engaged in conduct that was in bad faith and did not deal fairly with Plaintiffs.

3      53.    Plaintiffs performed all, or substantially all, of the things they were required to do

4  pursuant to the PSA.

5      54.    There is now due, owing, and unpaid from Defendants to Plaintiffs a sum to be

6  proven a trial, together with interest thereon.

7      55.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been

8  damaged in an amount subject to proof at trial as they have not received consideration they were

9  entitled to receive pursuant to the PSA.

10      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

11  hereinafter set forth.

12  **SIXTH CAUSE OF ACTION**

13  **(Breach of Fiduciary Duty against Growlife, Marco Hegyi, Mark Scott)**

14      56.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 55 of this Complaint

15  as if fully set forth herein.

16      57.    After performance of the First Closing, Growlife became the majority shareholder of

17  EZC at the date of the First Closing.  Exercising Growlife's control and influence over EZC,

18  Growlife's CEO, Marco Hegyi, appointed Growlife's CFO, Mark Scott, to also be EZC's CFO.

19  Hegyi and Scott also caused Mark Scott's son, Will Scott, to become EZC's controller.

20      58.    As a result of their majority shareholder position in EZC, Defendants owed Plaintiffs

21  fiduciary obligations.  As alleged herein, Defendants have breached their fiduciary obligations to

22  Plaintiffs by placing their own interests ahead of Plaintiffs' interests.

23      59.    Between the First Closing and July 20, 2020, Growlife, and its officers Marco Hegyi

24  and Mark Scott, used Growlife's majority shareholder position in EZC to compel and coerce EZC

25  into transferring funds from EZC to Growlife.  Between the First Closing and July 31, 2020,

26  Defendants compelled and coerced Plaintiffs into transferring approximately $336,000 from EZC to

27  Growlife.  Growlife, Hegyi, and Scott represented that the transfers were loans that would be paid

28  back to EZC, but later said that the Plaintiffs did not have any ownership or other interest in any of

{00012158.7}

the funds loaned from EZC to Growlife.  As holders of large numbers of shares in Growlife, Hegyi and Scott placed their own interests before the interests of EZC or EZC's minority shareholders by causing transfers of cash from EZC to Growlife, which Hegyi and Scott used to bolster Growlife's stock value and financial condition.

60.    Beginning in the second half of 2019 and extending into the first and second quarters of 2020, Growlife's cash demands placed EZC in a dire financial situation.  As EZC's cash reserves dwindled, Blackburn requested that Growlife return the funds to replenish EZC's cash position. Growlife refused to return the cash to EZC, and between late 2019 and the first half of 2020, EZC had significant problems meeting its financial obligations to vendors and suppliers.  This cash shortage caused EZC to be late on payments to its largest suppliers and vendors.  As a direct result of the late payments, EZC's key suppliers revoked the substantial credit EZC had developed over a many-years-long relationship and placed significant credit limitations on EZC's orders.  In turn, these limitations caused material and supply shortages just as EZC's orders were increasing at a very large pace.

61.    On January 14, 2020, Growlife's depletion of EZC's cash became so dire that EZC did not have sufficient cash to make its payroll.  Despite numerous requests from Blackburn to Growlife for return of the cash it had taken so that payroll could be completed, Mark Scott informed EZC's payroll manager that EZC would not be able to make payroll.  EZC's payroll manager became so distraught about not being able to pay her bills that she left and went home.  To avoid hardship to the EZC team, Blackburn caused $37,798.92 to be loaned from his personal account to EZC's account so that payroll could be made.

62.    As Growlife, Hegyi, and Scott, continued to demand further sums, Plaintiff Blackburn sought additional information regarding the reason for the transfers, and how the transfers were being accounted for in EZC's books.  Growlife, Hegyi, and Scott represented to Blackburn that the transfers had been properly accounted for, and that because Growlife is a publicly-traded company, they should trust that the transactions were proper.

63.    On June 29, 2020, Blackburn expressed concern to Hegyi about the numerous cash advances.  Hegyi suggested that Blackburn should express any further questions to Mark Scott.  On

{00012158.7}

1   the same day, Blackburn sent an email to Mark Scott seeking clarification on the details of the cash
2   transfers. Mark Scott responded that they would "be happy to detail this." Blackburn did not
3   receive any further response to his inquiries until July 13, 2020.

4       64.    On July 10, 2020, Hegyi and Blackburn spoke over the phone. In that call, Blackburn
5   expressed his continuing concerns about the cash advances between Growlife and EZC. Blackburn
6   was concerned about numerous issues with the transfers, but especially regarding how the cash
7   advances would be reconciled with Plaintiffs' continuing 49% ownership in the company, and also
8   how the transfers would be paid back. Defendants told Blackburn that Growlife and EZC were "one
9   company," and that "EZC's money is Growlife's money" and that Plaintiffs had no interest in EZC's
10  revenues or profits. Hegyi also told Blackburn that all of EZC's assets were the property of
11  Growlife, and that Plaintiffs did not have any interest in the cash transferred from EZC to Growlife.
12  Defendants' statements are contrary to applicable law.

13      65.    On July 10, 2020, Growlife, through Mark Scott, called Blackburn to ask that they
14  transfer an additional $60,000 to Growlife. Blackburn expressed his continuing concerns about the
15  transfers.

16      66.    On July 13, 2020, at 6:46 a.m., and the Monday following Scott's conversation with
17  Blackburn on July 10, Scott finally responded to Blackburn's June 29 questions. In his response,
18  Scott stated that Growlife maintained an "intercompany receivable and payable," suggesting that
19  Growlife was treating the transfers as loans. However, Scott also stated: "I have included the latest
20  corporate forecast. This is confidential. **We are one company.** All efforts to go EZ-CLONE. We
21  need the gm [gross margin] from EZ-CLONE to offset the costs of the parent. All of the sales,
22  commission, finance, marketing, public listing costs, audit, etc. are now held here. All of the sales
23  and GM are recorded at EZ." (Emphasis added.) Adding to Blackburn's concern, Scott closed his
24  email by stating: "When the tax returns are prepared, the tax firm may request a different form of
25  documentation." Mr. Scott provided no further explanation about why the documentation might be
26  "different" for tax-return purposes.

27      67.    On July 13, 2020, Scott and Hegyi sent Blackburn multiple emails and text messages
28  asking why Blackburn had "ignored" Mark Scott's request for cash, and instructed Blackburn to

1 | "remedy the matter immediately" demanding that they immediately transfer the $60,000 from EZC
2 | to Growlife. Further, Scott emailed Blackburn to demand transfer of the funds because Growlife
3 | "needed to release payroll." Blackburn responded: "I have received your texts about the wire
4 | transfer. I will have the transfer made today. Needless to say, much of my time on vacation this
5 | week is being spent thinking about my phone call with Marco last week. I am also worried about
6 | how these cash transfers are being handled, and we should definitely discuss further when I get back.
7 | I will have to take you at your word that the funds are being used properly."

8 | 68.   On the same day, Hegyi responded by threatening Blackburn for expressing
9 | reluctance or concern about how the transfers were being handled. Hegyi then expressed fictional
10 | concerns about Blackburn's "performance," which was a concern that Hegyi had never before
11 | expressed to Blackburn. Hegyi also claimed that Mark Scott had been "shielding" Blackburn from
12 | the alleged performance issues. More shocking, Hegyi threatened Blackburn with an "investigation"
13 | into the fictional issue. Plaintiffs are informed and believe that Hegyi's allegations were an attempt
14 | to fabricate a false basis to terminate Blackburn's management role in EZC. Later in the email,
15 | Hegyi reiterated the concept that Growlife and EZC were somehow the same company by stating
16 | that it is "against company policy to have only one signer on an account." While Growlife may have
17 | such a policy, EZC has no such policy. Plaintiffs are informed and believe that Hegyi's threats and
18 | statements were an attempt to intimidate Blackburn from making any further inquiry into the funds
19 | transfers, and offered "[w]hen you return, I can help you better understand the formalities you are
20 | initiating." Plaintiffs allege that Hegyi's statement was a veiled statement trying to induce
21 | Blackburn to stop asking questions about the transfers.

22 | 69.   Defendants' conduct placed their own interests above those of EZC and EZC's
23 | minority shareholders, and damaged both EZC and Plaintiffs. Plaintiffs have incurred damages in an
24 | amount to be proven at trial as a direct and proximate result of Defendants' conduct, and that
25 | conduct was a substantial factor in causing Plaintiffs' harm. Among other things, Plaintiffs have not
26 | received payments they were entitled to receive.

27 | 70.   Plaintiffs are informed and believe, and based thereon allege, that Defendants' actions
28 | alleged herein were performed with actual malice, oppression, and/or fraud and thus Plaintiffs seek

{00012158.7}

1    an award of punitive damages.

2    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as
3    hereinafter set forth.

4    ### SEVENTH CAUSE OF ACTION

5    ### (Breach of Employment Contract by Growlife)

6    71.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 70 of this Complaint
7    as if fully set forth herein.

8    72.    On or about October 2018, Blackburn and Growlife entered into an employment
9    agreement ("Employment Agreement") in which Blackburn was to take on the role of Division
10   President for Growlife.  In exchange, Blackburn was to be paid a salary in the amount of $150,000
11   per year, plus benefits.

12   73.    Blackburn performed all, or substantially all, of the things he was required to do
13   pursuant to the Employment Agreement.

14   74.    As alleged herein, Growlife failed to perform its obligations under the Employment
15   Agreement.  Among other things, Growlife has failed to pay Blackburn wages under the
16   Employment Agreement at any time.

17   75.    As a direct and proximate result of the breaches alleged herein, Blackburn has been
18   damaged in an amount subject to proof at trial as he has not received consideration he was entitled to
19   receive pursuant to the Employment Agreement.

20   WHEREFORE, Plaintiff Blackburn prays for judgment against Defendant Growlife as
21   hereinafter set forth.

22   ### EIGHTH CAUSE OF ACTION

23   ### (Violation of Labor Code against Defendants)

24   76.    Plaintiff realleges and incorporates herein Paragraphs 1 through 75 of this Complaint
25   as if fully set forth herein.

26   77.    At all relevant times herein, Labor Code sections 1182.12, 1194, 1197, and relevant
27   wage orders provided for payment of state-law minimum wages at the rate required by law.
28   Blackburn has not received any wages from Growlife.

{00012158.7}

1   78.   Defendants failed to pay Plaintiff Blackburn as required by California law.  Plaintiff

2   Blackburn is entitled to recovery of liquidated damages and penalties as provided by applicable law.

3   79.   At all relevant times, Marco Hegyi was the chief executive officer of Growlife, and as

4   such was a person acting on behalf of an employer.  At all relevant times, Mark Scott was the chief

5   financial officer of Growlife, and as such was a person acting on behalf of an employer.

6   80.   Under California Labor Code section 558.1, Growlife, Mr. Hegyi, and Mr. Scott were

7   employers or persons acting on behalf of an employer.  Growlife, Hegyi, and Scott violated

8   provisions covered by Labor Code section 558.1.

9   81.   Accordingly, Growlife, Hegyi, and Scott are liable for the violations.

10   WHEREFORE, Plaintiff Blackburn prays for judgment against Defendants, and each of

11   them, as hereinafter set forth.

12   ### NINTH CAUSE OF ACTION

13   ### (Preliminary and Permanent Injunctive Relief)

14   82.   Plaintiffs reallege and incorporate by this reference, as if set forth in full herein, the

15   allegations in paragraphs 1 through 81, above.

16   83.   PSA section 7.03 provides that between the First Closing and the Second Closing:

17
18
19
20
21   each Seller with an Employment Agreement, (in each case until his death, retirement, resignation or termination for Cause), shall continue to manage all aspects of the business including, without limitation, (i) determining the fees and prices charged by the Company, (ii) determining the compensation paid to employees or independent contractors of the Company, (iii) determining whether to discontinue or modify the Company's business or any program related thereto, (iv) making any decisions concerning the production, marketing, sales, capital expenditures, expenses and related matters respecting the Company and (v) making any decisions pertaining to the personnel, staffing and other resources of the Company.

22

23   84.   Because Defendants breached the PSA, the Second Closing has not occurred, and

24   therefore section 7.03 requires Blackburn to remain as the president and CEO of EZC.  Plaintiff

25   Blackburn is a Seller with an Employment Agreement as set forth in the PSA.  Blackburn is the

26   President of EZC, and has been the EZC President since well before the PSA was executed.

27   Blackburn has also been responsible for the vast majority of EZC's success through his management

28   of the EZC staff and management, and through relationships he has developed over many years with

{00012158.7}

1 | suppliers and customers.

2 |     85.    Despite having received the Rescission Notice, on August 24, 2020, Growlife through

3 | Mark Scott with copy to Mr. Hegyi, demanded that EZC transfer $50,000 to Growlife. Growlife

4 | stated that the transfer would cover "payroll, commissions and medical, primarily for the direct sales

5 | group." Plaintiffs are informed and believe that most of the funds requested would not be used for

6 | the purposes stated by Growlife. The expenses listed are exclusively for employees of Growlife. On

7 | August 27, 2020, and again on August 28, 2020, Growlife threatened Plaintiff Blackburn that if did

8 | not authorize the $50,000 transfer to Growlife, that Growlife would use that refusal as a basis to

9 | terminate Blackburn for "Cause" under Section 7.03. Contrary to Growlife's assertion, Blackburn's

10 | refusal to transfer further funds to Growlife does not meet the definition of "Cause" in the PSA, and

11 | in fact, is in furtherance of his duties to protect EZC—which is the entity defined as the "Company"

12 | under the PSA.

13 |     86.    Plaintiffs are informed and believe that Defendants will attempt to terminate

14 | Blackburn's management of EZC based on the threats made. Further, Plaintiffs allege that

15 | terminating Blackburn's management of EZC would do immediate and irreparable injury to EZC

16 | because doing so would lead to loss of customers, vendors, and employees that are critical to EZC's

17 | operations.

18 |     WHEREFORE, Plaintiffs pray that the Court issue a preliminary and permanent injunction

19 | against Defendants barring them from taking any action to remove Blackburn from managing EZC,

20 | or to take any action that would upset the EZC day-to-day operations.

21 |

22 | **TENTH CAUSE OF ACTION**

23 | **(Declaratory Relief)**

24 |     Plaintiffs reallege and incorporate by this reference, as if set forth in full herein, the

25 | allegations in paragraphs 1 through 86, above.

26 |     87.    An actual case and controversy has arisen and now exists between Plaintiffs and

27 | Defendants concerning their respective rights and duties in that Plaintiffs, as alleged herein, contend

28 | that they are entitled to rescind the PSA, while Defendants apparently contend that Plaintiffs are not

{00012158.7}

1    entitled to rescind the PSA.

2       88.     Plaintiffs request a judicial declaration that:

3               a.    Defendants' breach of the PSA entitled Plaintiffs to rescission of the PSA and

4                   restoration of all consideration exchanged in the First Closing and restitution

5                   of amounts necessary to place Plaintiffs in the positions they were in before

6                   the First Closing; and

7               b.    If the PSA is not rescinded, Defendants are liable under the PSA for amounts

8                   due, together with interest thereon.

9               c.    That Defendants have engaged in bad-faith conduct with respect to the PSA

10                   and operation of EZC.

11               d.    That Defendants are not permitted or entitled to change management of EZC

12                   as prohibited under Section 7.03 of the PSA.

13       89.     A judicial declaration is necessary and appropriate at this time so that the parties may

14    ascertain their rights and duties under the PSA.

15       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

16    hereinafter set forth.

17                      **PRAYER FOR RELIEF**

18       WHEREFORE, Plaintiffs prays judgment in Plaintiffs' favor and against Defendants, and

19    each of them as follows:

20       1.     For rescission of the PSA, as requested herein;

21       2.     For general, special, and consequential damages according to proof at trial;

22       3.     For exemplary and punitive damages according to proof at trial;

23       4.     For any and all statutory penalties that might be awardable in this action;

24       5.     For restitution and disgorgement of all illicit distributions alleged herein and that may

25            later be discovered in this action;

26       6.     For a temporary restraining order, preliminary injunction, and permanent injunction

27            as requested herein;

28       7.     For declaratory relief as requested herein;

{00012158.7}

8.     For an award of prejudgment interest;

9.     For reasonable attorneys' fees and costs of suit incurred herein; and

10.    For such other relief that the Court deems proper under the circumstances.

Dated: August 28, 2020                 REYNOLDS TILBURY WOODWARD LLP

By: _____

                   TREVEN TILBURY
                  Attorneys for Plaintiffs
          WILLIAM BLACKBURN and BRAD
                   MICKELSEN

{00012158.7}